**ORIGINAL**

FILED IN OPEN COURT
U.S.D.C. - Atlanta

JUN - 9 2021

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

HERBERT E. LEWIS

Criminal Indictment

No. **1:21CR0231**

THE GRAND JURY CHARGES THAT:

**Background**

At all times relevant to this Criminal Indictment:

**The Defendant and Associated Individuals and Entities**

1.      From in or around 2012 through the date of the indictment, the defendant, HERBERT LEWIS ("LEWIS"), a resident of Atlanta, Georgia, worked as an accountant and tax return preparer at an Atlanta accounting firm ("Accounting Firm 1").  LEWIS earned his certified public accountant ("CPA") license in or around 1984 and had prepared tax returns for at least 25 years.

2.      Accountant A, a co-conspirator known to the grand jury, was a CPA and founding partner of Accounting Firm 1.

3.      Accounting Firm 1 provided tax services including tax return preparation and tax planning advice to corporate and individual clients, including many high-net-worth individuals.

4.      Promoter A, a co-conspirator known to the grand jury, was a CPA and partner at Accounting Firm 2 ("Accounting Firm 2") until in or around 2002

1

when he left to start his own company, Company 1.  Promoter A, together with others, including LEWIS, organized, marketed, promoted, and sold "real estate investment funds" which were, in reality, tax shelters in the form of syndicated conservation easements (the "SCE Shelters" or "Shelters").

5.      Since at least 2008, Promoter A and Company 1—directly, or through various corporate intermediaries—served as "manager" for the SCE Shelters. Promoter A, through Company 1, organized, promoted, and sold at least 23 SCE Shelters.

6.      Promoter B, a co-conspirator known to the Grand Jury, worked for Promoter A and Company 1 since at least 2012.  Promoter B assisted Promoter A with the promotion and marketing of the SCE Shelters including serving as a primary point of contact for various CPAs and financial advisors (the "co-promoters") that sold "units" in the Shelters for Promoter A.

7.      Attorney A, a co-conspirator known to the Grand Jury ("Attorney A"), worked for Promoter A and Company 1 since at least 2012.  Attorney A assisted Promoter A with the creation, marketing, and implementation of the fraudulent syndicated SCE Shelters.

8.      Stein Agee, a co-conspirator, was a partner and accountant at Accounting Firm 2.  Among other things, Agee prepared federal partnership tax returns, including Forms 1065, "U.S. Returns of Partnership Income," and related Forms K-1 (Forms 1065), "Partner's Share of Income, Deductions, Credits, etc.," for the SCE Shelters from at least 2014 through 2018.

9.      Land Conservancy 1 was a purported non-profit 501(c)(3) organization, founded in North Carolina, that claimed in its mission statement to be "dedicated to protecting natural resources through conservation easements."

10.      Land Conservancy 2 was a purported non-profit 501(c)(3) organization founded in Pennsylvania that claimed as its primary purpose "preserving and managing open space with ecological, agricultural or historical significance."

11.     Appraiser 1, a co-conspirator, was a licensed appraiser based in North Carolina who performed conservation easement appraisal work for Promoter A and Company 1 since at least 2008.

12.     Appraiser 2, a co-conspirator, was a licensed appraiser based in Atlanta, Georgia, who performed conservation easement appraisal work for Promoter A and Company 1 since at least 2015.

## The Internal Revenue Service and its Forms

13.     The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States.

14.     The IRS accepted tax returns via electronic filing using the Internet. The IRS did not maintain any computer servers that processed electronically-filed tax returns in the state of Georgia.   All electronic returns were processed outside of the state of Georgia.

15.     An IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040"), was a form used by U.S. taxpayers to report income, gains, losses, deductions, credits, taxes, etc.  Typically, a tax year for an individual income tax return began on January 1 of that year and concluded on December 31st of that same year.

16.     An IRS Form 1065, U.S. Return of Partnership Income ("Form 1065"), was an information return filed by partnerships to report information such as income, gains, losses, deductions, and credits.  A partnership did not pay tax on its income but "passed through" any profits or losses to its partners.  Partners were required to report partnership items on their individual tax returns.

17.     A Schedule K-1 (Form 1065), Partner's Share of Income, Deductions, Credits, etc. ("Schedule K-1"), was a schedule of the IRS Form 1065 filed with the IRS and issued by the partnership to its members reporting each partner's

distributive share of partnership income or loss, among other items. Among other items, a Schedule K-1 reported the partner's "capital contributed during the year."

## Background Related to Partnerships and Pass Through Entities

18.     Under the Internal Revenue Code (the "Code") and associated regulations, the term "partnership" included a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is operated. A limited liability company ("LLC") with two or more members was treated as a partnership for federal income tax purposes unless it affirmatively elected to be treated as a corporation.

19.     An entity taxed as a partnership was referred to as a "pass through" or "flow through" entity because it was not itself liable for income tax. Instead, its partners, or members, were proportionally liable, in their separate or individual capacities, based on the income, losses, deductions, or credits "passed through" the entity. For example, a partnership would "pass through" to its individual members certain tax deductions, including non-cash charitable contributions such as a conservation easement donation that the individual reported on his or her individual income tax return, Form 1040, and related schedules

## Charitable Deductions, Qualified Conservation Contributions, and Conservation Easements

20.     Under the Code and associated regulations, subject to certain limitations, a taxpayer could take a deduction for a "charitable contribution" made within the taxable year. The amount of the deduction generally equaled the fair market value of the contributed property (here, the value of the conservation easement) on the date of the charitable contribution, except as otherwise specified in the Code.

21.     Generally, a taxpayer could not claim a charitable contribution deduction for a contribution of a partial interest in property. However, the Code

and associated regulations made an exception for a "qualified conservation contribution."

22.    A qualified conservation contribution was a contribution of a qualified real property interest, to a qualified organization (such as a qualified 501(c)(3) organization), exclusively for conservation purposes. A contribution was not a qualified conservation contribution unless the conservation purpose of the contribution was protected in perpetuity and certain other requirements were satisfied.

23.    A conservation easement was a legal agreement through which a landowner and another party, typically a qualified organization, agreed to permanently restrict the development and/or use of the land with the purpose of achieving certain conservation or preservation goals.

24.    Conservation purposes included: (1) the preservation of land areas for outdoor recreation by, or for the education of, the general public; (2) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem; (3) the preservation of open space (including farmland and forest land) where such preservation is for the scenic enjoyment of the general public, or pursuant to a clearly delineated Federal, State, or local governmental conservation policy and will yield a significant public benefit; and (4) the preservation of an historically important land area or a certified historic structure.

25.    A properly structured conservation easement was one type of "qualified real property interest," under the Code and associated regulations, a taxpayer's donation of which could form the basis for a charitable contribution deduction.

26.    If a taxpayer held the easement property for more than one year, then the taxpayer could deduct the fair market value of the donated conservation easement as determined at the time of contribution. If the property was held for less than one year, the taxpayer's deduction was limited to its cost or basis.

27.     The Code and associated regulations required that the value of a conservation easement be determined in a qualified appraisal which must be prepared no earlier than 60 days before the date of contribution and no later than the due date of the tax return on which the charitable contribution deduction was first claimed.  A taxpayer claiming a non-cash charitable contribution based on the donated conservation easement was required to attach a copy of the qualified appraisal to the Form 1040 filed with the IRS.

28.     The fair market value of the conservation easement was generally determined to be the difference between the fair market value of the underlying property before it was encumbered by the conservation easement and the fair market value of the underlying property after the easement was granted.

29.     Subject to certain exceptions, when an individual taxpayer donated a conservation easement as a charitable contribution in a manner consistent with the Code and associated regulations, he or she could use the deduction associated with the donation of the easement to offset up to 50 percent of his or her taxable income for the relevant taxable year, and could carry forward any excess for up to 15 years.  The total amount the taxpayer could deduct depended on the fair market value of the conservation easement.

### The SCE Shelters LEWIS Promoted

30.     From at least 2014 through 2019, LEWIS promoted and sold units in at least 12 SCE Shelters.  Each of these Shelters purchased ownership interests in one or more entities that owned real property (the "Property Companies").  Each year, the Property Companies donated conservation easements over a portion of the real property it owned.  At the time they were donated, the conservation easements were appraised at values significantly higher than what the Shelter had paid to purchase its interest in the Property Company that owned real property over which the easement had been donated.  In total, the conservation easement donations generated hundreds of millions of dollars in tax deductions that were passed through to the SCE Shelters and its client-taxpayer partners who purchased units in the Shelters (hereinafter referred to as "participants") as follows:

*Inland Capital Investment Fund 2014*

    a. On or about July 3, 2013, Promoter A and other co-conspirators organized and caused to be organized Inland Capital Investment Fund 2014 ("ICIF 2014"). ICIF 2014 purportedly purchased, through an intermediary entity, a majority interest in Inland Bluffton, LLC ("Inland Bluffton") which owned approximately 316.95 acres of real property in Beaufort County, South Carolina.

    b. On or about December 31, 2014, Inland Bluffton donated a conservation easement on approximately 239.375 acres of the real property to Land Conservancy 1. Based on the appraisal valuation of the easement, Inland Bluffton's conservation easement donation generated $35,994,812.49 of charitable contributions that were passed through ICIF 2014 to each participant in ICIF 2014.

    c. ICIF 2014 also purportedly purchased, through an intermediary entity, a majority interest in Mountaintop Property Investments, LLC ("Mountaintop") which owned approximately 4.3 acres of real property within the Western District of North Carolina.

    d. On or about December 31, 2014, Mountaintop donated a conservation easement on approximately 4.3 acres of real property to Astronomy Club of Asheville, Inc. Based on the appraisal valuation of the easement by Appraiser 1, Mountaintop's conservation easement donation generated $3,908,240 of charitable contributions that were passed through ICIF 2014 to each participant in ICIF 2014.

*Southern Appalachian Investment Fund 2014*

    e. On or about October 30, 2014, Promoter A, together with Attorney A and other co-conspirators, organized Southern Appalachian Investment Fund 2014 ("SAIF 2014") as a North Carolina limited partnership. SAIF 2014 purportedly purchased an ownership interest in Thompson Mountain Holdings, LLC ("Thompson Mountain"),

which owned approximately 273.88 acres of real property located within the Western District of North Carolina.

f.  On or about December 31, 2014, Thompson Mountain purportedly donated a conservation easement on approximately 213.63 acres of the real property to Land Conservancy 1. Based on the appraisal valuation of the easement prepared by Appraiser 1, Thompson Mountain's conservation easement donation generated $23,512,800 of charitable contributions that were passed through SAIF 2014 to each participant in SAIF 2014.

*Inland Capital Appalachian Fund 2015, LLC*

g.  On or about December 19, 2014, Promoter A, together with Attorney A and other co-conspirators, organized Inland Capital Appalachian Fund 2015, LLC ("ICAF 2015") as a Georgia LLC. ICAF 2015 purportedly purchased an ownership interest in Jenny's Lane, LLC ("Jenny's Lane"), which owned approximately 5.00 acres of real property located within Lyon County, Nevada.

h.  On or about December 29, 2015, Jenny's Lane donated a conservation easement on approximately 5.00 acres of real property to Healthy Communities Coalition of Lyon County and Storey County. Based on the appraisal valuation of the easement prepared by Appraiser 2, Jenny's Lane's conservation easement donation generated $10,780,000 of charitable contributions that were passed through ICAF 2015 to each participant in ICAF 2015.

i.  ICAF also purportedly purchased an ownership interest in NC Whisper Mountain Holdings, LTD ("Whisper Mountain"), which owned approximately 178.426 acres of real property located within the Western District of North Carolina.

j.  On or about December 31, 2015, Whisper Mountain donated a conservation easement on approximately 178.426 acres of the real

8

property to Land Conservancy 1. Based on the appraisal valuation of the easement prepared by Appraiser 1, Whisper Mountain's conservation easement donation generated $13,239,800 of charitable contributions that were passed through ICAF 2015 to each participant in ICAF 2015.

*Inland Capital Property Fund 2015, LLC*

k. On or about December 19, 2014, Promoter A, together with Attorney A and other co-conspirators, organized Inland Capital Property Fund 2015, LLC ("ICPF 2015") as a Georgia LLC. ICPF purportedly purchased an ownership interest in Chestatee Holding Company, LLC ("Chestatee"), which owned approximately 207.495 acres of real property located within the Northern District of Georgia.

l. On or about December 31, 2015, Chestatee donated a conservation easement on approximately 196.419 acres of the real property to Land Conservancy 1. Based on the appraisal valuation of the easement prepared by Appraiser 1, Chestatee's conservation easement donation generated $35,983,980 of charitable contributions that were passed through ICPF 2015 to each participant in ICPF 2015.

*Coastal Properties Holdings, LLC*

m. On or about November 18, 2015, Promoter A and Attorney A organized, and caused to be organized, Coastal Properties Holdings, LLC ("CPH"), a Georgia entity. Promoter A and other co-conspirators purportedly caused CPH to purchase, through an intermediary entity, a majority interest in Crimson Independence LLC ("Crimson Independence") which owed real property in Jasper County, South Carolina.

n. On December 30, 2016, Crimson Independence donated a conservation easement on approximately 1,330.773 acres of the real property to Land Conservancy 1. Based on the appraisal valuation of

the easement prepared by Appraiser 2, Crimson Independence's conservation easement donation generated $170,310,016.80 of charitable contributions that were passed through CPH to each participant in CPH.

o. CPH also purportedly purchased an ownership interest in Old Paris Holdings, LLC ("Old Paris"), which owned approximately 282.229 acres of real property located in Stewart County, Tennessee.

p. On December 29, 2016, Old Paris donated a conservation easement on approximately 241.30 acres of the real property to Land Conservancy 1. Based on the appraisal valuation of the easement prepared by Appraiser 2, Old Paris' conservation easement donation generated $14,994,540 of charitable contributions that were passed through CPH to each participant in CPH.

*Inland Capital Sierra Holdings, LLC 2016*

q. On or about April 30, 2015, Promoter A, together with Attorney A and other co-conspirators, organized Inland Capital Sierra Holdings, LLC 2016 ("ICSH") as a Georgia LLC. ICSH purportedly purchased an ownership interest in Hillside Holdings, LLC ("Hillside"), which owned approximately 326.33 acres of real property located in Washoe County, Nevada.

r. On or about December 29, 2016, Hillside donated a conservation easement on approximately 326.33 acres of the real property to Land Conservancy 2. Based on the appraisal valuation of the easement prepared by Appraiser 2, Hillside's conservation easement donation generated $42,203,750 of charitable contributions that were passed through ICSH to each participant in ICSH.

s. ICSH also purportedly purchased an ownership interest in Nautical Hill Holdings, LLC ("Nautical Hill"), which owned approximately 85.05 acres of real property located in Lincoln County, Oregon.

t.  On or about December 28, 2016, Nautical Hill donated a conservation easement on approximately 60.82 acres of the real property to Land Conservancy 2. Based on the appraisal valuation of the easement prepared by Appraiser 2, Nautical Hill's conservation easement donation generated $7,222,786.20 of charitable contributions that were passed through ICSH to each participant in ICSH.

*Community Investment Partnership 2017*

u.  On or about September 14, 2016, Promoter A, together with Attorney A and other co-conspirators, organized Community Investment Partnership, LLC ("CIP") as a Georgia LLC. CIP purportedly purchased an ownership interest in Figure 8 Highlands, LLC ("Figure 8"), which owned approximately 2,126.57 acres of real property located in Baldwin County, Alabama.

v.  On or about December 28, 2017, Figure 8 donated a conservation easement on approximately 1735.23 acres of the real property to Land Conservancy 2. Based on the appraisal valuation of the easement prepared by Appraiser 2, Figure 8's conservation easement donation generated $164,250,000 of charitable contributions that were passed through CIP to each participant in CIP.

*Open Vista Holdings 2017*

w.  On or about September 14, 2016, Promoter A, together with Attorney A and other co-conspirators, organized Open Vista Holdings, LLC ("OVH") as a Georgia LLC. OVH purchased an ownership interest in Sandlapper Hill, LLC ("Sandlapper"), which owned approximately 58.17 acres of real property located in Beaufort County, South Carolina.

x.  On or about December 29, 2017, Sandlapper donated a conservation easement on approximately 53.433 acres of the real property to Land

Conservancy 2. Based on the appraisal valuation of the easement prepared by Appraiser 2, Sandlapper's conservation easement donation generated $24,175,800 of charitable contributions that were passed through OVH to each participant in OVH.

y. OVH also purportedly purchased an ownership interest in Argent TH A, LLC ("Argent"), which owned approximately 63.12 acres of real property located in Jasper County, South Carolina.

z. On or about December 27, 2017, Argent donated a conservation easement on approximately 63.12 acres of the real property to Osprey Village, Inc. Based on the appraisal valuation of the easement prepared by Appraiser 2, Argent's conservation easement donation generated $8,953,400 of charitable contributions that were passed through OVH to each participant in OVH.

*Coastal Community Partners, LLC 2017*

aa. On or about September 14, 2016, Promoter A, together with Attorney A and other co-conspirators, organized Coastal Community Partners, LLC ("CCP") as a Georgia LLC. CCP purportedly purchased an ownership interest in Figure 8 Georgia, LLC ("Figure 8 Georgia"), which owned approximately 1,202.36 acres of real property located within the Northern District of Georgia.

bb. On or about December 28, 2017, Figure 8 Georgia donated a conservation easement on approximately 863.26 acres of the real property to Land Conservancy 2. Based on the appraisal valuation of the easement prepared by Appraiser 2, Figure 8 Georgia's conservation easement donation generated $95,841,900 of charitable contributions that were passed through CCP to each participant in CCP.

*Mountaintop Vista Holdings, LLC 2018*

cc. On or about April 17, 2018 date, Promoter A, together with Attorney A and other co-conspirators, organized Mountaintop Vista Holdings, LLC ("Mountaintop Vista") as a Georgia LLC.  Mountaintop Vista purchased an ownership interest in Winnemucca Holdings, LLC ("Winnemucca"), which owned approximately 1,088.43 acres of real property located in Washoe County, Nevada.

dd. On or about December 28, 2018, Winnemucca donated a conservation easement on approximately 812.43 acres of the real property to Land Conservancy 2.  Based on the appraisal valuation of the easement prepared by Appraiser 2, Winnemucca's conservation easement donation generated $51,460,200 of charitable contributions that were passed through Mountaintop Vista to each participant in Mountaintop Vista.

*Eastern Sierra Holdings, LLC 2018*

ee. On or about June 27, 2018, Promoter A, together with Attorney A and other co-conspirators, organized Eastern Sierra Holdings, LLC ("ESH") as a Georgia LLC.   ESH purportedly purchased an ownership interest in Storm Crow, LLC ("Storm Crow"), which owned approximately 773.32 acres of real property located within Alpine County, California.

ff. On or about December 27, 2018, Storm Crow donated a conservation easement on approximately 557.12 acres of the real property to Land Conservancy 2.  Based on the appraisal valuation of the easement prepared by Appraiser 2, on February 11, 2019, Storm Crow's conservation easement donation generated $76,662,000 of charitable contributions that were passed through ESH to each participant in ESH.

*Southeast Property Acquisitions, LLC 2018*

gg. On or about October 9, 2018, Promoter A, together with Attorney A and other co-conspirators, organized Southeast Property Acquisition, LLC ("SPA") as a Georgia LLC. SPA purportedly purchased an ownership interest in Equity Investment Associates, LLC ("EIA"), which owned approximately 1920.63 acres of real property located in Brunswick County, North Carolina.

hh. On or about December 27, 2018, EIA donated a conservation easement on approximately 1297.58 acres of real property to Land Conservancy 2. Based on the appraisal valuation of the easement prepared by Appraiser 1, EIA's conservation easement donation generated $178,440,000 of charitable contributions that were passed through SPA to each participant in SPA.

31.     From tax year 2014 through tax year 2018, LEWIS and his co-conspirators, promoted and sold these SCE Shelters to hundreds of wealthy taxpayers, and over the same period of time, these Shelters generated at least $900 million in tax deductions for those same wealthy taxpayers, based on the donations of the conservation easements.

## Count One
*Conspiracy to Defraud the United States*
(18 U.S.C. § 371)

32.     The Grand Jury re-alleges and incorporates by reference the factual allegations in paragraphs one through 31 of this Criminal Indictment.

33.     From in or about October 2014 through at least March 2020, both dates being approximate and inclusive, in the Northern District of Georgia and elsewhere, the Defendant, HERBERT E. LEWIS, did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree with other individuals both known and unknown to the Grand Jury to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government

functions of the Internal Revenue Service of the Department of Treasury in the ascertainment, computation, assessment, and collection of revenue, that is, U.S. individual income taxes.

## Object of the Conspiracy

34.    It was the purpose and object of the conspiracy for LEWIS and his co-conspirators to unjustly enrich themselves and their clients by organizing, marketing, implementing, and selling fraudulent tax shelter transactions in the form of syndicated conservation easement donations and by preparing and filing fraudulent federal income tax returns unlawfully claiming charitable contribution deductions.

## Manner and Means

35.    The manner and means by which HERBERT E. LEWIS and his co-conspirators, and others known and unknown to the Grand Jury, carried out the objects of the conspiracy include, among others:

*Lewis and Others Design, Market, and Implement*
*Fraudulent SCE Shelters*

36.    LEWIS, Promoter A, Promoter B, Accountant A, and other co-conspirators (collectively, the "Promoters") promoted the SCE Shelters to wealthy taxpayers  described ostensibly as "real estate investment funds" with multiple purported business purposes such as developing land, holding land for future appreciation in value, or conserving land in order to share the resulting tax deduction with the partnership's investors with a potential to develop or sell the residual property not placed in easement.

37.    From at least 2014 through 2018, the co-conspirators designed, organized, promoted, and sold SCE Shelters using similar methods:

    a.   Typically, for each Shelter, Promoter A, with the assistance of various co-conspirators, identified a parcel or parcels of real property owned

by an existing partnership or limited liability company (the "Property Companies").

b. Promoter A and other co-conspirators would and did create the SCE Shelter, usually in the form of an LLC to buy a significant interest in Property Companies that owned the real property. Promoter A and the co-conspirators would and did determine how many units in each SCE Shelter were available to sell based on a pre-existing formula that included the anticipated appraisal value of the easement and the amount of money needed to raise from participants while simultaneously delivering the tax benefits ratio advertised to the taxpayer clients.

c. Promoter A, Promoter B, and other co-conspirators, directly and through various co-promoters, including LEWIS, would and did promote the SCE Shelters to wealthy taxpayers who were subject to high tax rates. The promoters offered units in the Shelters for $25,000 per unit.

d. Promoter A, Promoter B, Attorney A, and other co-conspirators determined and distributed a tax savings "ratio" for any given SCE Shelter to LEWIS and other co-promoters at the time the SCE Shelter was introduced. For example, in general, each year, in or around late spring or early summer, Promoter A and Promoter B met with LEWIS and Accountant 1 to provide information about that year's SCE offerings. During this meeting Promoter A and Promoter B provided LEWIS and Accountant 1 with the tax savings ratio the Shelters would provide.

e. The tax ratio that was provided to prospective participants, often as early as spring or summer, was dependent upon the final appraised amount of the conservation easement, which was often not completed until January or February after the easement was donated. In nearly every Shelter, the final appraisal delivered the promised tax ratio to the Shelters' participants.

16

f.  The predetermined tax ratio allowed LEWIS and other co-promoters to advise clients on how many units to purchase in order to maximize the reduction of their taxes based upon their income.  The ratios for the SCE Shelters were normally 1:4 or higher, meaning for every unit purchased, the taxpayer could expect to claim a non-cash charitable deduction on his or her tax return of four times that amount. So, for example, for every $100,000 of units purchased by a taxpayer, he or she would report a non-cash charitable deduction of approximately $400,000, and would receive, depending on his or her tax rate, approximately $170,000 back in the form of tax savings, often within months of making the initial purchase.

g.  LEWIS and other co-promoters began marketing the SCE Shelter tax shelter to wealthy individuals touting the favorable tax-savings ratios.  Because the Shelters always offered the tax deductions, and because the tax ratio was generally the same each year, LEWIS sometimes began promoting the Shelters to his clients before the year's Shelter offerings were even available.  This was so because LEWIS knew that the Shelters – despite purportedly offering a development option- were going to always provide tax deductions through the donation of a conservation easement.

h.  As part of the promotion of the SCE Shelters, LEWIS, Promoter A, Promoter B, and other co-conspirators, provided a private placement memorandum ("PPM") and subscription agreement to potential participants.  In an effort to make the SCE Shelters appear to have a business purpose beyond the mere sale of tax benefits, LEWIS, Promoter A, Promoter B, and other co-conspirators, marketed the Shelters with the appearance of three available options for clients: 1) develop and sell the land for profit; 2) hold the land for long-term appreciation; or 3) place a portion of the land in conservation easement with a portion held for development (also known as the "green option").  In a further effort to make the Shelters appear to have a legitimate business purpose, LEWIS, Promoter A, and other

17

co-conspirators told participants that the "residual property"—the property remaining after the donation of the conservation easement—might eventually be developed or sold.

i.  According to the marketing materials LEWIS and other co-conspirators provided to potential participants, following the acquisition of the real property in question, Company 1, as the "manager" of the Shelter, would make a "recommendation" to the participants about which one of the three options to pursue, and the participants would then "vote" on whether or not to approve the selected option. According to one PPM, "if" the green option was selected through this process, the participants could offset up to 50% of their adjusted gross income because of the donated conservation easement. In reality, Company 1 would and always did recommend option 3 -- the "green option," involving the donation of a conservation easement, which was required in order for participants to claim the marketed tax deduction and receive the full tax benefit.

j.  To join the Shelter, each participant was required to complete and sign a subscription agreement, which included the number of units to be purchased.

k.  At the end of each calendar year, the Shelter held the purported vote to determine which of the three options to pursue for the property. For every SCE Shelter promoted by Promoter A, LEWIS, and the other co-conspirators for the 2014 through 2018 tax years, the "vote" resulted in the selection of the "green option"—meaning 100% of the time, the vote resulted in the conservation easement/tax deduction option.

l.  After the purported vote for the "green option," the Property Company, in December of the given tax year, placed a portion of the land into a conservation easement, and then donated the conservation easement to Land Conservancy 1 or Land Conservancy 2, thus generating the promised charitable contribution deduction that

flowed through to the individual participants who had purchased units in the Shelters.

m. Each year, Appraiser 1 or Appraiser 2—the two appraisers used by Promoter 1- generated a final appraisal for the real property over which the conservation easement was donated that provided a purported value before the easement was donated and a value after the easement was donated. The final appraisal value for the real property prior to donation was substantially exceeded the purchase price the Property Company had originally paid for the property. Furthermore, the final appraisal value for the real property always substantially exceeded the amount the Shelter paid the Property Company to purchase its ownership interest in the Property Company.

38.     At times, some of the predetermined number of available units in the Shelters had been sold to wealthy participants by the end of the tax year for which the deductions were designed to be generated. So, to generate additional revenue from these Shelters, LEWIS, Promoter A, Promoter B, and other co-conspirators sold units in the Shelters after the tax year had closed. In those circumstances, the participants were often instructed by LEWIS and others to backdate the subscription agreements and to backdate the checks, to make it appear that they had purchased their units before the close of the preceding tax year and before the conservation easement was donated.

39.     For at least five SCE Shelters organized and sold between 2014 and 2019, LEWIS and other co-conspirators marketed and sold units to wealthy participants to generate tax benefits after the tax year had concluded. Consequently, based on the late purchases alone, the participants were not entitled to claim the charitable contribution deductions, either in full or in part, on their Forms 1040 for that tax year.

*Lewis Prepared False and Fraudulent Income Tax Returns*

40.     After securing payment from wealthy participants in the manner described above, both before and after the relevant tax year closed, LEWIS, and other co-conspirators caused Schedule K-1s to be prepared by Stein Agee and Accounting Firm 1 that were filed with the IRS and issued to each of the participants in the relevant Shelter(s) that reported a non-cash charitable contribution more than four times his or her capital contribution.

41.     For the tax years 2014 through 2018, LEWIS prepared and filed, and caused to be prepared and filed, false individual income tax returns for his participant clients that claimed tax deductions generated by the SCE Shelters transactions.  Additionally, for many of these tax returns, LEWIS advised those clients to purchase units in the SCE Shelters after the close of the tax year. LEWIS further instructed these participants to backdate documents to make it appear as if they had subscribed to the Shelter and/or purchased units in the Shelter during the prior year. Knowing that those participant-clients were not entitled to claim the charitable deduction related to the SCE donations for the prior year, LEWIS prepared returns that claimed the deduction anyway.

*Lewis Profited from the Fraudulent SCE Scheme*

42.     Individuals who promoted the SCE scheme were paid significant fees for their efforts.  As dictated by Company 1, all Shelters paid commissions to those who sold units to participants.   In total, during the years 2015 through 2020, Company 1 paid LEWIS more than $1 million based on his sales of units in the various SCE Shelters.

Overt Acts

43.     To accomplish the object of the conspiracy, HERBERT E. LEWIS and his co-conspirators, and others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in the Northern District of Georgia and elsewhere:

44.    In 2014, LEWIS sold units in the SCE Shelters to wealthy client participants.

45.    On or about October 21, 2014, LEWIS sent an email to clients CLIENT-1 and CLIENT-2 promoting the SCE Shelters as tax deductions, stating, "At your tax rates the rate of return should end up being over 100%. These guys always keep money in the LLC to defend IRS challenges if they should come, which is another reason I like them. I will talk with you each individually about the amounts I think you should buy."

46.    On or about October 28, 2014, LEWIS emailed client CLIENT-3 documents pertaining to CLIENT-3's potential purchase of units of ICIF 2014, and stated, "The more I look into this the more convinced (sic) this is something you should do."

47.    On or about October 31, 2014, in an email with the subject line "Conservation Easement," LEWIS promoted the SCE Shelters to clients CLIENT-4 and CLIENT-5, stating,

> I wanted to touch base one more time on this easement thing. It is selling quickly. I am going to be out of town Monday and Tuesday. I hope there are still some units available when I get back. I think this thing is the best safe tax savings tool I have seen in a long time; probably ever.  I recommend [CLIENT-4] putting in $25,000, which will save about $41,000 in federal and state income tax expense.  I recommend [CLIENT-5] to put in $50,000, which will save about $45,000 in federal and state income tax expense... I think you guys pay way too much in tax and this is a great tax break.

48.    On or about November 6, 2014, LEWIS emailed client CLIENT-3 about potentially purchasing units in the 2014 SCE Shelters.  LEWIS attached a "2014 Tax Benefit Calculator" to the email that allowed CLIENT-3 to calculate the number of units CLIENT-3 should purchase in an SCE Shelter in order to enable CLIENT-3 to deduct 50% of CLIENT-3's adjusted gross income.  The calculator

stated the conservation easement "creates $4.40 of deductions for every $1.00 of membership share cost."

49.     During 2015, LEWIS sold units in the 2014 SCE Shelters to at least six participant clients after the close of the tax year and generated, or caused to be generated, false documents to make it appear that the participant clients had purchased units prior to the close of the 2014 tax year and prior to the date the conservation easement was donated.

50.     On or about February 11, 2015, LEWIS sent an email promoting the 2014 SCE Shelters to clients CLIENT-4 and CLIENT-5, suggesting they purchase units in 2014 SCE Shelters,

> I recommend you [CLIENT-4] buy 2 units and [CLIENT-5] buy 3 units. Call me and we can go over the details but if you buy 2 units you will not owe anything at April 15th and will not need to make any estimated tax payments in 2015.

51.     On or about February 17, 2015, LEWIS emailed clients CLIENT-1, CLIENT-6, CLIENT-7, CLIENT-8, CLIENT-9, CLIENT-4, and CLIENT-5 about purchasing units in the 2014 SCE Shelters after the tax year had closed. The email stated, "You [sic] additional units are guaranteed. The developer [Promoter A] came by my office this morning and told me that is no problem," meaning that LEWIS's clients would be permitted to purchase additional units in 2014 SCE Shelters in year 2015. Making clear that the donation had already taken place, LEWIS continued:

> The managers of the LLC that owns the property put into Conservation Easement have 2 funds for 2014. One is a fund that allows for a contribution deduction amount of 30% of Adjusted Gross Income (AGI) and the other is a fund that allows a 50% of AGI contribution. I can go into all the details of this if you would like, but the explanation would be way too involved for an email. The point in using the 2 funds is to be sure you get the full 50% of AGI deduction.

22

52.     On or about March 4, 2015, LEWIS emailed client CLIENT-4 and advised CLIENT-4 to make payments and sign documents related to ICIF 2014 and SAIF 2014.  This email was after the participants had already "voted," and ICIF 2014 and SAIF 2014 had already donated the conservation easements.  LEWIS wrote, "Please send payment to me along with the signed and initialed paperwork as soon as you can, which will let them [Company 1] finalize the K-1s."

53.     On or about March 4, 2015, LEWIS exchanged emails with client CLIENT-3 with the subject line, "Conservation Easement" in which he explained that CLIENT-3's participation in one 2014 SCE Shelter had been switched to two Shelters.  LEWIS further informed CLIENT-3 that he still needed to pay for some of his 2014 purchase of units, and pitched purchasing future units in the 2015 Shelters, as follows:

      a.  LEWIS informed CLIENT-3 that instead of participating in only ICIF 2014, his units had been moved and he was "actually invested in 2 funds."  LEWIS then asked CLIENT-3 to sign an attached form entitled "Authorization and Instruction to Move Subscription," which provided authorization to "convert the discussed portion of my subscription for Units in Inland Capital Investment Fund 2014, LLC (ICIF) into the equivalent Units of Southern Appalachian Investment Fund 2014, LLC (SAIF)."  This form had been pre-filled with a backdate of "11/7/2014."

      b.  LEWIS further told CLIENT-3, "Next time I see you I will discuss the details and get the full paperwork signed.  For now they just need authorization from you that it is ok to move money you have paid around to accomplish that goal."

      c.  LEWIS reminded CLIENT-3, with respect to CLIENT-3's purchase of units, CLIENT-3 had "one payment of $25,000 left to be made" even though by this time, ICIF 2014 and SAIF 2014 had already "voted" to donate a conservation easement, and the easement had already been donated.

   d. LEWIS inquired about CLIENT-3's income for the current year and pitched participating in that year's Shelter, "Did your deal for this year close? If so we need to get you into the 2015 LLC so you can get a tax savings this year as well." On the same date, after CLIENT-3 informed LEWIS that CLIENT-3's business deal will close in 2015 thus increasing CLIENT-3's income, LEWIS responded, "I will get you the information on the 2015 [SCE] Fund soon since it sounds like it is going to be a big income year again."

  54. In 2015, LEWIS and other co-conspirators prepared false individual income tax returns for the 2014 tax year for participants that claimed non-cash charitable contributions based on their purchases of units in the SCE Shelters.

  55. During 2015, LEWIS sold units in the 2015 SCE Shelters to his wealthy client participants.

  56. In response to concerns CLIENT-10 had expressed about purchasing units in an SCE Shelter only through Company 1, on or about May 5, 2016, LEWIS emailed WB:

> If you were looking for a return as an investment in the company I think that would be a concern. However, since in less than a year you get all your money back through tax savings I do not think that is a concern...I have a sense...that putting more [charitable deductions from conservation easements] from different sources would increase the opportunity to have IRS scrutiny.

  57. On or about October 20, 2016, LEWIS emailed client CLIENT-9 and wrote:

> I'm going to be meeting with the [Company 1] folks in the next couple of weeks. They want me to give them what I think my final numbers are and when to expect the subscriptions to come in...I know you said income for 2016 will not be as high as for 2016 [sic], but do you think

you will still need a unit?...Just let me know what you think your total income will be. I know you will have the gain from the sale of the Condo we need to take into account.

58.     In 2017, Promoter A, LEWIS, and other co-conspirators sold units to wealthy participants in CPH after the close of the 2016 tax year and generated or caused to be generated false documents to make it appear as if the participants had purchased units before close of the tax year and before the conservation easement had been donated.

59.     In 2017, LEWIS and other co-conspirators prepared false individual income tax returns for the 2016 tax year for participants that claimed non-cash charitable contributions based on their purchase of units in the SCE Shelters.

60.     In 2017, LEWIS and other co-conspirators sold units in the 2017 SCE Shelters to wealthy participants.

61.     In 2018, Lewis, Promoter A, and other co-conspirators sold units to wealthy participants in CCP after the close of the 2017 tax year and generated or caused to be generated false documents to make it appear as if the participants had purchased units before close of the tax year and before the conservation easement had been donated.

62.     On or around January 22, 2018, LEWIS emailed client CLIENT-11 about his purchase of units in CCP, and stated that CLIENT-11's check for purchase of one unit, "[i]t just needs to be made payable to Coastal Community Partners, LLC in the amount of $25,000 and dated the same day the agreement was signed (12/29/17)."

63.     In 2018, LEWIS prepared at least one false 2017 tax return for a participant that purchased units in CCP during 2018, after the close of the 2017 tax year.

64.     In 2018, LEWIS, Promoter A, and other co-conspirators sold units in 2018 SCE Shelters to wealthy participants.

65.     In 2019, LEWIS, Promoter A, and other co-conspirators promoted and sold units in SPA after the close of the 2018 tax year.

66.     In 2019, LEWIS unlawfully instructed certain clients who had purchased units in SPA during 2019 to backdate their subscription agreements and backdate their checks to make it appear as if they had been executed during the 2018 tax year.

67.     In or around September 2019, LEWIS unlawfully instructed client CLIENT-7 to backdate a check for purchase of units in SPA.  LEWIS instructed CLIENT-7 to date the check December 2018 to make it appear that the check had been signed in September 2019.

68.     In or around 2019, LEWIS unlawfully instructed client CLIENT-2 to backdate two checks for purchase of units in SPA.

69.     Between on or around October 8, 2019 and on or around October 15, 2020, LEWIS prepared false and fraudulent returns for clients that reported false charitable contribution deductions, each such return constituting an overt act.

All in violation of Title 18, United States Code, Section 371.

## Counts Two through Twenty-Five
*Wire Fraud*
(18 U.S.C. § 1343 and § 2)

70.     The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 69 of this Criminal Indictment as if fully set forth herein.

71.     Beginning in or about January 2014 and continuing until in or about March 2020, the exact dates unknown, in the Northern District of Georgia and elsewhere, the Defendant, HERBERT E. LEWIS, aided and abetted by others known and unknown to the Grand Jury, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by

means of materially false and fraudulent pretenses, representations, and promises, and by omissions of material fact, well knowing and having reason to know that said pretenses, representations, and promises were false and fraudulent when made and caused to be made and that said omissions were and would be material, to wit, LEWIS participated in a fraudulent scheme to defraud the IRS by organizing, promoting, selling, and implementing tax shelters, in the form of fraudulent syndicated conservation easements, in order to fraudulently reduce the tax liability of their clients and to unjustly enrich themselves through the payment of fees and commissions,

72.    On or about the dates listed below for each count, in the Northern District of Georgia and elsewhere, HERBERT E. LEWIS, aided and abetted by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and omissions of material fact, did, with intent to defraud, cause to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, signals, and sounds, as more specifically described below:

| Count | Date (on or about) | Interstate Wire Communication |
|---|---|---|
| Count 2 | 4/15/2016 | Electronic filing of CLIENT-6's 2015 Form 1040 with the IRS |
| Count 3 | 5/5/2016 | Email from Lewis to CLIENT-10 referenced in paragraph 58 above |
| Count 4 | 10/13/2016 | Electronic filing of CLIENT-1's 2015 Form 1040 with the IRS |
| Count 5 | 10/14/2016 | Electronic filing of CLIENT-9's 2015 Form 1040 with the IRS |
| Count 6 | 10/14/2016 | Electronic filing of CLIENT-8's 2015 Form 1040 with the IRS |
| Count 7 | 10/13/2017 | Electronic filing of CLIENT-9's 2016 Form 1040 with the IRS |

| Count 8 | 10/15/2017 | Electronic filing of CLIENT-6's 2016 Form 1040 with the IRS |
|---|---|---|
| Count 9 | 10/15/2017 | Electronic filing of CLIENT-2's 2016 Form 1040 with the IRS |
| Count 10 | 1/22/2018 | Email from Lewis to CLIENT-11 referenced in paragraph 64 above |
| Count 11 | 4/3/2018 | Electronic filing of CLIENT-11's 2017 Form 1040 with the IRS |
| Count 12 | 9/19/2018 | Electronic filing of CLIENT-6's 2017 Form 1040 with the IRS |
| Count 13 | 10/4/2018 | Electronic filing of CLIENT-3's 2017 Form 1040 with the IRS |
| Count 14 | 10/8/2019 | Electronic filing of CLIENT-3's 2018 Form 1040 with the IRS |
| Count 15 | 10/9/2019 | Electronic filing of CLIENT-6's 2018 Form 1040 with the IRS |
| Count 16 | 10/9/2019 | Electronic filing of CLIENT-2's 2018 Form 1040 with the IRS |
| Count 17 | 10/10/2019 | Electronic filing of CLIENT-7's 2018 Form 1040 with the IRS |
| Count 18 | 10/11/2019 | Electronic filing of CLIENT-10's 2018 Form 1040 with the IRS |
| Count 19 | 10/12/2019 | Electronic filing of CLIENT-1's 2018 Form 1040 with the IRS |
| Count 20 | 10/13/2019 | Electronic filing of CLIENT-12's 2018 Form 1040 with the IRS |
| Count 21 | 10/13/2019 | Electronic filing of CLIENT-8's 2018 Form 1040 with the IRS |
| Count 22 | 10/14/2019 | Electronic filing of Client-5's 2018 Form 1040 with the IRS |
| Count 23 | 10/14/2020 | Electronic filing of CLIENT-7's 2019 Form 1040 with the IRS |
| Count 24 | 10/14/2019 | Electronic filing of CLIENT-4's 2018 Form 1040 with the IRS |

| Count 25 | 10/15/2020 | Electronic filing of CLIENT-3's 2019 Form 1040 with the IRS |
|---|---|---|

All in violation of Title 18, United States Code, Section 1343 and Section 2.

**Counts Twenty-Six Through Fifty-Seven**
*Aiding and Assisting the Filing of False Tax Returns*
(26 U.S.C. § 7206(2))

73.     The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 72 of this Criminal Indictment as if fully set forth herein.

74.     On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, the Defendant, HERBERT E. LEWIS, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under the Internal Revenue Laws, of U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules for the taxpayers and calendar years specified below.  The returns were false and fraudulent as to material matters, in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue Laws to claim non-cash charitable contributions related to SCE Shelters identified below on Schedule A in the amounts listed on the taxpayers' returns, whereas, as LEWIS then and there knew and believed, these taxpayers were not entitled to claim those non-cash charitable contributions:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 26 | CLIENT-7 | 10/7/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1 A ($237,613), B ($19,315), C ($288,264), and D ($31,299)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $542,606<br>c. Form 1040, Line 43, (Taxable Income) $483,249 |
| Count 27 | CLIENT-7 | 10/10/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B $446,100 |
| Count 28 | CLIENT-7 | 10/14/2020 | 2019 | a. Schedule A, Line 13, (Charitable Contribution Carryover) $64,101<br>b. Form 1040, Line 11b, (Taxable Income) $833,453 |
| Count 29 | CLIENT-3 | 10/5/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1D ($111,976)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $152,272<br>c. Form 1040, Line 43, (Taxable Income) $122,523 |
| Count 30 | CLIENT-3 | 10/4/2018 | 2017 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $118,817<br>b. Form 1040, Line 43, (Taxable Income) $87,506 |
| Count 31 | CLIENT-3 | 10/8/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1A ($1,115,250) |
| Count 32 | CLIENT-3 | 10/15/2020 | 2019 | a. Schedule A, Line 13, (Charitable Contribution Carryover) $186,925<br>b. Form 1040, Line 11b, (Taxable Income) $2,116,461 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 33 | CLIENT-4 | 6/3/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($10,255), 1B ($153,046), 1C ($16,617), 1D ($52,853)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $201,986<br>c. Form 1040, Line 43, (Taxable Income) $208,355 |
| Count 34 | CLIENT-4 | 10/14/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($111,525) |
| Count 35 | CLIENT-5 | 6/3/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($6,839), 1B ($102,064), 1C ($11,082), 1D ($221,824)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $320,407<br>c. Form 1040, Line 43, (Taxable Income) $267,020 |
| Count 36 | CLIENT-5 | 10/14/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($334,575) |
| Count 37 | CLIENT-6 | 10/13/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1C ($264,711)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $510,512<br>c. Form 1040, Line 43, (Taxable Income) $456,881 |
| Count 38 | CLIENT-6 | 04/15/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $15,302<br>b. Form 1040, Line 43, (Taxable Income) $545,239 |
| Count 39 | CLIENT-6 | 10/15/2017 | 2016 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $17,530<br>b. Form 1040, Line 43, (Taxable Income) $537,564 |
| Count 40 | CLIENT-6 | 9/19/2018 | 2017 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $16,608<br>b. Form 1040, Line 43, (Taxable Income) $508,779 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|-------|----------|--------------------------|----------|--------------------------|
| Count 41 | CLIENT-6 | 10/09/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1C ($446,100) |
| Count 42 | CLIENT-10 | 10/05/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1E ($193,158)<br>b. Second Form 8283, Section 1, Part I, Line 1A ($15,268), 1B ($227,867), 1C ($24,741)<br>c. Schedule A, Line 17, (Non-Cash Charitable Contribution) $464,111<br>d. Form 1040, Line 43, (Taxable Income) $848,407 |
| Count 43 | CLIENT-10 | 10/11/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($446,100)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $346,099<br>c. Form 1040, Line 10, (Taxable Income) $314,177 |
| Count 44 | CLIENT-8 | 10/14/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($15,073), 1B ($224,962), 1C ($24,426), 1D ($196,405)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $415,437<br>c. Form 1040, Line 43, (Taxable Income) $367,614 |
| Count 45 | CLIENT-8 | 10/14/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $45,429<br>b. Form 1040, Line 43, (Taxable Income) $488,317 |
| Count 46 | CLIENT-8 | 10/13/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1A ($892,000) |
| Count 47 | CLIENT-2 | 10/15/2017 | 2016 | a. Form 8283, Section 1, Part I, Line 1A ($614,860) 1B ($54,134)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $627,419<br>c. Form 1040, Line 43, (Taxable Income) $646,295 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 48 | CLIENT-2 | 10/9/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($557,625) |
| Count 49 | CLIENT-2 | 10/15/2020 | 2019 | a. Schedule A, Line 13, (Charitable Contribution Carryover) $137,369<br>b. Form 1040, Line 11b, (Taxable Income) $610,365 |
| Count 50 | CLIENT-11 | 4/3/2018 | 2017 | a. Form 8283, Section 1, Part I, Line 1A ($108,912)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $108,912<br>c. Form 1040, Line 43, (Taxable Income) $117,561 |
| Count 51 | CLIENT-9 | 9/23/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($26,427), 1B ($5,127), 1C ($76,523), 1D ($8,309)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $98,615<br>c. Form 1040, Line 43, (Taxable Income) $81,210 |
| Count 52 | CLIENT-9 | 10/14/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $17,991<br>b. Form 1040, Line 43, (Taxable Income) $92,756 |
| Count 53 | CLIENT-9 | 10/13/2017 | 2016 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $7,340<br>b. Form 1040, Line 43, (Taxable Income) $126,102 |
| Count 54 | CLIENT-1 | 10/14/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($240,524), 1B ($19,140), 1C ($285,660), 1D ($31,016)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $499,154<br>c. Form 1040, Line 43, (Taxable Income) $456,152 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 55 | CLIENT-1 | 10/13/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $15,909<br>b. Form 1040, Line 43, (Taxable Income) $539,255 |
| Count 56 | CLIENT-1 | 10/12/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($446,100) |
| Count 57 | CLIENT-12 | 10/13/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($111,525)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $158,076<br>c. Form 1040, Line 10, (Taxable Income) $133,851 |

All in violation of Title 26, United States Code, Section 7206(2).

## Counts Fifty-Eight Through Sixty-Two
*Subscribing to False Tax Returns*
(26 U.S.C. § 7206(1))

75.     The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 74 of this Criminal Indictment as if fully set forth herein.

76.     Beginning in 2015, in addition to his salary from Accounting Firm 1, LEWIS began receiving commissions from Company 1 for his sale of the SCE Shelters for the tax years 2014 through 2019.

77.     On or about December 4, 2015, LEWIS formed, and caused to be formed several entities, for use as nominees to help conceal his receipt of commissions from the SCE Shelter sales including the following:

   a. L Family LLC ("L Family") was a limited liability company formed in the state of Georgia in or around December 2015.

34

b.  BWL Sales, Inc. (BWL Sales) was a corporation formed in the state of Georgia in or around December 2015.  LEWIS identified his teenaged son as the sole shareholder of the entity.

c.  HAL Inc. was a corporation formed in the state of Georgia in or around December 2015.  LEWIS identified his minor daughter as the sole shareholder of the entity.

78.     Instead of reporting the full amount of his Company 1 commissions on his Forms 1040 for the years 2015 through 2019, LEWIS underreported his total income by causing $307,238 of his commissions to be reported on HAL Inc.'s and BWL Sales' tax returns.  Because HAL Inc. and BWL Sales were flow-through entities, Lewis caused the commissions ultimately to be reported on his children's Forms 1040.  As a result of his unlawful assignment of income, LEWIS paid less taxes on the commission income he reported on his children's federal income tax returns because it was taxed at a lower tax rate.

79.     On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, the Defendant, HERBERT E. LEWIS, did willfully make and subscribe false U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules, for the tax years set for below, each of which was verified by a written declaration that it was made under the penalties of perjury, and each of which was filed with the IRS, which tax returns LEWIS did not believe to be true and correct as to one or more material matters, in that the tax returns underreported LEWIS's total income when, as the defendant LEWIS then and there well knew and believed, his total income exceeded the amounts reported on the returns as follows:

| Count | Tax Year | Date Filed (on or about) | Materially False Items |
|---|---|---|---|
| Count 58 | 2015 | 10/20/2016 | Line 22, Total Income, $158,454 |
| Count 59 | 2016 | 10/12/2017 | Line 22, Total Income, $190,588 |

| Count 60 | 2017 | 4/26/2018 | Line 22, Total Income, $253,316 |
| Count 61 | 2018 | 10/15/2019 | Line 6, Total Income, $216,947 |
| Count 62 | 2019 | 10/13/2020 | Line 7b, Total Income, $235,274 |

Each in violation of Title 26, United States Code, Section 7206(1).

### Forfeiture

80.    The Grand Jury re-alleges and incorporates by reference the factual allegations contained in Counts 2 through 27 of this Criminal Indictment as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).

81.    Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1343, the Defendant, HERBERT E. LEWIS shall forfeit to the United States of America all property, real or personal, involved in the offense and any property traceable thereto. The property to be forfeited includes, but is not limited to, the following:

*Money Judgment*

82.    A sum of money equal to the amount of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to violations of the money laundering offenses set forth in this indictment.

83.    If any of the property described above, as a result of any act or omission of the Defendant:

a.    cannot be located upon the exercise of due diligence;

36

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c).

A _____ BILL

FOREPERSON

KURT R. ERSKINE
*Acting United States Attorney*

*Thomas J. Krepp*
THOMAS J. KREPP
*Assistant United States Attorney*
Georgia Bar No. 346781

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303

404-581-6000; Fax: 404-581-6181

*Brittney Campbell*
BRITTNEY CAMPBELL
*Department of Justice, Tax Division Trial Attorney*
NC Bar No. 31433

*Grace Albinson*
GRACE ALBINSON
*Department of Justice, Tax Division Trial Attorney*
New York Attorney Reg. No. 4952697

*Casey Smith*
CASEY SMITH
*Department of Justice, Tax Division Trial Attorney*
Connecticut Bar No. 436378

*Parker Tobin*
PARKER TOBIN
*Department of Justice, Tax Division Trial Attorney*
Virginia No. 91126